Hear ye, hear ye, this Honorable Appellate Court for the 2nd District is now open. The Honorable Justice Joseph E. Burkett presiding, along with Justice Catherine E. Zinoff and Justice Liam C. Brennan. The case is number 2-19-09-23, Buffalo Grove Venture, LLC, Plaintiff-Appellee v. 400 McHenry Road, LLC, Defendant-Appellant. Arguing for the Appellant, William J. Anaya. Arguing for the Appellee, Tyler Manick. Mr. Anaya, you may proceed. Thank you, Your Honor. My name is Bill Anaya, and I represent the Appellant. With me today at Council table, virtual Council table, is Mr. Felton, someplace in Oak Park, and capable Counselors representing the Appellee, Tyler Manick. He's sitting at opposing Counsel's virtual table. What we have here today is a simple case of contract interpretation. It's a 29-year-old contract. None of the parties to the contract are existent today. Plaintiff and the trial court were wrong to interpret that Plaintiff can benefit by and enforce the 1991 Development Agreement. By its very terms, the 1991 Development Agreement benefited only the parties to that agreement and their, their respective successors and assigns. It's important to recognize that the parties themselves made it clear that it was a personal limitation on the length of the term of the contract, limited to their, their respective parties and their respective successors and assigns. No subsequent owners were allowed to proceed. We take that information from paragraph 11. And paragraph 11 is on sub-c 39, wherein the parties decided at that particular point that paragraph, paragraph 25 were limited, according to subsection C, they will inert to the benefit of the parties and their respective successors and assigns. They will inert to the benefit of the parties and their successors and assigns. Plaintiff appellee argues the first sentence is authoritative to the extent that it speaks to the entire, entire agreement, but that provision also provides the same limitation. It will only inert to the benefit of the parties and their successors and assigns. Who are the parties? Who are the successors and assigns? If you look at sub-c 49, the sign-up pages, one party was Buffalo Grove Town Center Partnership and Illinois Limited Partnership. No one succeeded the partnership. The partnership's interest in the 1991 development agreement was not assigned. Another party was the Buffalo Grove Joint Venture and Indiana General Partnership. No one succeeded the joint venture, and the joint venture did not assign its interest in the development agreement to anyone. The other party was the Michael Reeves Health Plan, Inc., was referred to as the owner. There is no dispute that none of the parties to the 1991 development agreement exist today or are involved in this litigation. There is no dispute that any party in this litigation is a successor to any of the parties of the 1991 agreement. Even so, plaintiff appellee argues the right to enforce the 1991 development agreement and collect the maintenance fee not as a successor to the joint venture and not as an assignee of the joint venture in the 1991 development agreement, but as what plaintiff calls a successor in interest to the joint venture. By that, plaintiff appellee means that plaintiff appellee is a subsequent owner. Part of the property that was once owned by the joint venture, it bears repeating. Plaintiff concedes that it is not a successor to the joint venture and acknowledges that it's not an assignee of any interest in the development agreement, but that it has the right and authority to enforce the development agreement and collect the fee because it now owns part of some of the property that was once owned by the joint venture. However, there is no such thing in the law as a successor in interest. Only a successor. As the trial court pointed out, the term successor in interest is not even used in the 1991 development agreement. In the Spiegel case we cited, a successor in interest is only a successor, and a successor is found only where the second party continues to retain the same rights as the original, and there is no change in ownership of the assets. In this instance, plaintiff is only a transferee of some of the property that was once held by the joint venture, and a subsequent owner of part of the joint venture parcel is not a successor entity, is not a successor to the joint venture entity. The Larkin case we cited in our briefs also exemplifies the point. A successor refers to instances where an entity through legal succession assumes the rights and obligations of the first entity. We also note the Fairways County Lakes Townhouse Association case, which further exemplifies the point. In that case, the court held that according to the Fairways court, generally the purchase of one corporation's property by another does not subject the purchasing corporation to the liabilities of the seller, and more importantly, nor does it entitle that party to exercise the seller's rights unrelated to the property. Those rights only accrue when there has been a consolidation or merger of the corporation or the purchasing corporation, is it merely a continuation of the seller. In this instance, plaintiff is an Illinois LLC and did not assume the Indiana General Partnership's interest. Here as in Fairways, the party seeking to enforce the agreement is only a purchaser of some of the assets of the first party, not a successor, but only a subsequent transferee. Here, like in Fairways, plaintiff is not involved in the continuation of the operation of the joint venture. Here, like in Fairways, plaintiff in this case voluntarily assumed, we were told, voluntarily assumed some of the obligations in the development agreement, but that only makes this plaintiff a volunteer. It does not make this person a successor or a sign. Like in Fairways, taking plaintiff's appellee's argument to the logic of the conclusion would mean that everyone that owns a piece of the former joint venture parcel would have a right to enforce the development agreement on a piecemeal basis. That can't be the law. That can't be what we're looking at. Bolero and the Boston market area are the two outlots mentioned by Mr. Maroney in his depositions. I suggest that we look at the deeds at sub C-121 to 125 and at sub C-135 to 144. Those are the two outlots from the original joint venture parcel. There are now three parties that own the joint venture parcel. Like Fairways, this court should find that there is no intention contained in the 1991 development agreement to extend it beyond the terms of the development. And the development agreement itself, as the trial court pointed out, was the development of the Michael Reese parcel, something that happened in 1991 and probably ended sometime around 1993. Like Fairways, this court should strictly enforce the strictly construe the covenants so that they will not extend beyond that which is expressly provided in the agreement. And all doubts must be resolved in favor of the free use of the property and against restrictions. As in Fairways, this court should recognize the paramount rule for constructing the covenants to give effect to the actual intent of the parties in the context of a 1991 development of the Michael Reese parcel into a medical facility. Here in the context of the development agreement signed in 1993 by three parties concerned only with the development of the Michael Reese parcel, the 1991 development agreement only bound and inured to the benefit of the parties and their respective successors and assigned. No one else and certainly not a mere subsequent owner of part of the property was included. If they had meant subsequent owners, it's a real easy fix. They could have said and subsequent owners. They did not. Like in Fairways, the covenants related to the entrance magazine were personal to the parties involved in that contract. And this court should not hold in the absence of finding a success for a sign that the covenants referred to in the maintenance fee did not terminate. They terminated clearly when the agreement ended and the agreement ended when the parties no longer existed nor did they have a successor in the sign. This is not a harsh result. This is exactly what the parties intended in 1991 and it is provided within the four corners of the development agreement. Nowhere does the development agreement provide that the benefits and burdens of the 1991 development agreement inured to the benefit of subsequent owners of the respective properties. It is what they meant. That is what they said. They did not say subsequent owners. Other provisions of the 1991 development agreement support our position. Paragraph 4C. I took a lot of discussion in the briefing about paragraph 4C. Therein the parties provided that the roadway fee remained Michael Reese's obligation even if Michael Reese sold any or all or any part of the Michael Reese parcel to a third party. It applied only to Michael Reese. Specifically paragraph 4C said the partnership and joint venture agreed to look to the third party transferee for payment, but if the payment was not forthcoming, then Michael Reese remained obligated to pay the fee. This provision would be entirely meaningless under plaintiff's interpretation. Under plaintiff's interpretation, that transferee would be bound by the terms of this agreement. The fact of the matter is paragraph 4C tells us very clearly that the parties did not intend it to go to subsequent owners. They provided in the event of a subsequent owner, Michael Reese would stay obligated to pay the fee, pay the fee in the development process. Another example is that paragraph 16 of the agreement wherein the parties described that the developer only has the right. The developer is a collective entity known as the joint venture and as the partnership. Only those two parties have the right to enforce the agreement. Is that time? Yes. We'll wrap up and then we'll take questions from the panel. Okay. I'm sorry, am I out of time? You're not out of time. You have five minutes. I beg your pardon. Okay. In other words, the developer, by identifying the developer paragraph 16, that they intended that it was only to last as long as the development itself. Another example is the easement found in paragraph 9A. The easement was not a public easement. There was a lot of briefing about that. It was a limited easement. It was only given to Michael Reese, its owners and invitees, and it referred specifically to a prerecorded plan of subdivision, Buffalo Grove Pound Center Unit Number 1, subdivision recorded November 28th as document number 2737813 in Lake County. We provided a larger copy of that to the court, the eight and a half by 11 didn't quite take it, and you couldn't really read it, so we provided a larger copy. It's sub C 315, 319, the oversize was delivered. Therein, the plan of subdivision provides the actual easement. It was reported three years earlier. The wedged in easement at 9A simply incorporated by reference that public easement. No one currently needs or uses the easement of paragraph 9A. In the context of the development in 1991, the de-easement at page 9A was limited to Michael Reese and terminated when the development agreement terminated. It is clearly not used. It is clearly not needed. What is needed, it was the 1988 plan of subdivision which provided access to the shopping center, provided access to the Michael Reese parcel, and provided access to the public. Mr. Anaya, can you hear me? I can't hear you. Mr. Anaya? Yes? We have questions. Are you finished with your main argument? I have two more points to make. Okay. Go ahead. The other two provisions of the agreement that I would point to the court were Exhibit C on the agreement of C56 which clearly identifies a very short entrance magazine and a very short entrance to the Michael Reese parcel and paragraph 10 provides for a very short period of time. Nowhere in this agreement, any place in this agreement can you find any indication that it was to last in perpetuity. In the final analysis, what is the current status? The current status is to apply to subdivision where the parties have access to the, where the current parties have access to Town Place Parkway, the shopping center, and things like that. By terminating this agreement, people don't lose access. They have access through that 1988 agreement. We suggest that the agreement isn't absurd, the interpretation is absurd, and we ask that the trial court and remand the matter back to the trial court for discussion on the counterclaims. Thank you, Your Honor. We'll give you a few questions right now. Justice Zinoff, your questions. Yes. Thank you very much. Counsel, you started out by saying really that the parties made it clear that this CCR was really personal in nature. There was a personal limitation to this contract, but actually there is evidence to the contrary. Is there not? Specifically, where these original parties intended a covenant to be personal and to terminate on transfer of the parcel, the parties knew how to express this. And if we look at the third sentence of paragraph 11, and I'll quote it, it's worded very differently, is it not? And it says, except as provided above with respect to paragraph 4 and 25, the covenant's restrictions, conditions, and provisions contained in this agreement do not constitute covenants running with the partnership parcel, but are personal to the partnership and shall bind an inure to the benefit of only the partnership and signment entity, et cetera. And there is another example of that. Is there not? And that is the intent of the parties. If we look to the whereas clauses. And one of the whereas clauses says, in addition or as additional, I don't have the exact words in front of me, so I'm paraphrasing, in additional consideration for the sale of the parcel to the owner, the parties have agreed to subject the parcel to the terms of this agreement. And so just looking at those two provisions, that really, that evidence is contrary to your interpretation of this contract, is it not? Not at all. Let me explain. Paragraph 4C, the third sentence in paragraph 11 relates to the partnership parcel. There were two parcels here. There was the joint venture parcel and the partnership parcel. The partnership parcel, as you'll see on the signature pages, had different investors. They had different entities. And the signment people had common ownership with some of the parcels, but each of the investors were different. So they carved out, and we don't know exactly why, Judge, but they carved out this extra thing so that the signment entities, it was clear that only the signment entities were assinees that could take advantage of this contract. It dovetails very well with the fact that the agreement itself, and it does, as you correctly point out, in the whereas clauses and in the other parcel, which I can't read my handwriting right now, the fact of the matter is that they all tie to the agreement. And the agreement itself says that it terminates with the parties or their respective successors in a sign. So yes, it does have that carve out. And yes, the parties knew how to do that. And yes, the parties had in 1991 different investors where they had to make a distinction for that partnership parcel. But you'll notice it's not on the joint venture parcel. They don't do that carve out. They didn't need to. It was already involved in Paragraph 11, and I would suggest Paragraph 11, the second sentence where it says that the parties and their respective signs are the only people that this benefited and it inverted the benefit of. So my suggestion is we don't know, Judge, and your point is very well taken. We don't know because none of the parties are in existence today and none of them are in this litigation. We can only read the document the way it looks. The four corners of that agreement. And when they refer to the agreement, they absolutely, without question, terminate that agreement at the end of the respective parties' existence or their successors in a sign. There were no successors. There were no signs. And the parties no longer exist. You can't step into the shoes and be a volunteer. We know we're talking about covenants here that run with the land. That's the language. Isn't it black-lettered law certainly here that covenants that run with the land do adhere in the land and do bind all subsequent owners? The covenants run with the land, Judge, but they run with the land as it's described in the agreement. They don't run in perpetuity. We understand that they ran in the land for the purposes of this agreement and they terminated when the parties no longer existed and there were no successors in a sign. Covenants did run with the land for a short period of time. Now, the fairway court tells us how we handle those kinds of things. It's very clearly a personal obligation, a personal benefit, if you will, to the parties in their respective signs. There was no assignment and there was no successor. Now, if this covenant were limited temporarily in this agreement, would it not landlock the owner's parcel here? No. That's the point of the Platte of Subdivision. That's the Platte of Subdivision itself that preexisted that agreement. They had access already. In 1988, they had access. Now, probably in 1991, if you look at the Platte of Subdivision itself, it talks about roads to be constructed. Now, my guess is in 1991, and we're not there, we don't have anybody that can testify to that. I can only read the four corners of the agreement. And in that agreement, and it's pretty clear to me that the roads probably did not exist, but they had access today from that 1988 access agreement that's provided in the Platte of Subdivision. We do not need this agreement. This agreement is meaningless. It focused on the subject matter of the agreement, and that was only the development of the Michael Reese parcel. Now, you talked about the language successor and interest. The trial court really didn't use that and found that the plaintiff was the successor in title. And in fact, the plaintiff here is in the joint ventures chain of title. Is it not? The plaintiff is a subsequent owner, a transferee, like in Fairways and like in the Larkin case. A mere transferee is not a successor. And it owns that part of the joint venture property containing this entrance magazine, does it not? It does. It does. And the Platte of Subdivision made that a private road, and the obligation to maintain that lays with the party who owns the property upon which the road lie, and that is the shopping center owner has to operate and maintain that particular roadway that's on its Platte of Subdivision. Platte of Subdivision gives us access. It's a private road. It's not a public road. It's never dedicated to the village of Buffalo Grove. It was only a private road. Now, Buffalo Grove probably doesn't like this anymore. They probably don't do this anymore because it's kind of a silly thing to do to have it be a private road, but it was cheaper, and it encouraged probably the development of this particular property. It should have been a dedicated road. It was not. They're private roads, and that entrance magazine, the obligation, according to the terms of the Platte of Subdivision, is for the owner of that parcel to maintain that road. In 1991 to about 1993, they had a cost-sharing arrangement between those parties then and now. It does not run with the land forever. Would they never say subsequent purchasers? Never. Okay. At this time, I will defer additional questions to the other panel members. Thank you, Justice Zinoff. Justice Brennan. So 11A says that the covenants are made for the direct and mutual benefit of the parcel and the joint venture parcel and each and every portion thereof. And then 11B states it will bind every owner of a portion of the parcel and the joint venture parcel to the extent that such portion is affected. Now, I know 11B doesn't, and this is pointed out in the briefs, doesn't use the word subsequent, but to the extent that the covenants run with the land, isn't the word subsequent essentially implied? I mean, if it runs with the land, doesn't the obligation to help pay for it run with the land? I mean, isn't that a fair reason? It's a disagreement. I guess you might be able to make that argument, Judge, if they didn't have 11C. If they didn't say, to the benefit of the parties and their respective successors and assigns. That limits that. That specifically limits the duration of this agreement. It's absolutely clear. I'm not arguing that it doesn't run with the land and it didn't run with the land for the two or three years that it applied. We don't know. We don't know how long it took to develop the Michael Reese parcel. But if you look at Exhibit C, what we're talking about is a very narrow road in and a very short road to the Michael Reese parcel. That's on sub C56. To suggest that it's a needed easement now for access is wrong. The needed easement is in the plan of subdivision that was prerecorded in 1988. If, to your point, 11B might be something if they didn't limit it with 11C. All I can do is look at the four corners of the agreement. If the whole point of this was merely just to get to that period of time when the construction was completed, how come the payments didn't commence until after construction was completed? That's when the road was available. That would be my guess. Again, we weren't there in 1991. I'm not sure. But that's when the road was completed. You couldn't pay for a road that wasn't completed. You couldn't pay for a road that you didn't have. As we correctly pointed out, that particular lot was landlocked at the time. You couldn't pay for a road that didn't exist. All right. Thank you. I don't have any additional questions. Thank you. Mr. Anaya, the agreement did provide for payment after the development was complete, correct? I don't know that it did. I can't say that it did. The language that I read says that it did. Would you agree that a party's performance or actions are directly relevant to the intent of a contract? The party's actions are directly relevant to the intent of the contract. The parties in 1991, their actions were directly related. They were the parties to the contract. We're not a party to the contract. During argument on the motions for summary judgment, the trial court asked between 2008 and 2011 whether or not your client paid. And Mr. Schwartz answered that is correct. That was not contested, was it? We paid. And as you'll see, we did pay. We were told, and that's part of our fraud count, we were misrepresented to, intentionally misrepresented to, that there was some common area maintenance activities being paid for in common by other parties for particular activities. We simply asked for what those activities were and we were told, no, you don't get that information. You just got to pay. After three years worth of wrangling over that, we decided that, okay, there's no there there. We're just going to stop paying because we don't think you have the right or authority to do it. The agreement terminated. I'm not going to say my clients didn't, they operated in good faith. I don't want their good faith to be used against them. They are good corporate citizens. They operate a medical facility. They accept that there are things like common area maintenance charges that are applied to a lot of their units and a lot of their properties. And they took Buffalo Grove Venture at their word. It turned out they didn't have the authority that they said they did. So we objected from the very beginning. They stepped into the shoes, as Justice Zinoff noted. They inherited title to the property or they have title to the property that was the subject of the original agreement, correct? No. They are a subsequent owner of the property and what the agreement says is that the agreement endures only to the benefit of the parties and their successors and signs. As a subsequent purchaser, they're not a successor. They're not a successor. They own the road, correct? And aren't such agreements commonplace in shopping center developments? Are they commonplace? No. Not at all. This is an anomaly. Maintenance is often shared. The payment for maintenance. If we were part of the joint venture parcel, like all of the entities that are like the Bolero and the Burger King and the Boston Market, those people are all part of the joint venture parcel. And they do have common area maintenance fees on their parcel. The partnership parcel where we're located is north of that parcel and did not have any obligation to pay any common area maintenance fees. This was strictly and only a construction road. Are you familiar with... I'm sorry? Are you familiar with Keel versus Peck, a 1925 decision? I am not. In that case, the parties changed. New owners. And the argument was that a 99-year lease and an option to buy did not run with the land. And the Supreme Court held that the language of the contract, that covenants running with the land, applied to the successive owners. How is that case... How is it any different? And I understand your interpretation of various provisions of the contract, but this provision had to do with this particular parcel, did it not? It had... That's a difficult question to answer because there's a lot to unpack in that. I'm going to guess that the Keel versus Peck case identified the actual parcel itself. We're on a different parcel. The at issue in this case isn't a 99-year lease with an option to purchase. At issue in this case is an agreement that by its terms terminated when the parties no longer existed and they didn't leave a successor and they didn't leave a sign. That's significantly different than the Keel versus Peck case. Okay. Thank you, Mr. Anaya. Mr. Manik, your argument. Thank you, Your Honor. May it please the court. A lot of the points that I wanted to raise in our argument were addressed by a lot of the questions that this panel raised in response to Mr. Anaya's presentation. While Buffalo Grove filed this lawsuit as a straightforward breach of contract action, this appeal presents you with a series of convoluted and esoteric issues that have resulted from Foreign & McHenry's shifting defenses, which I believe ignore the plain terms of the CCR agreement, the law in Illinois, and are ultimately internally inconsistent when viewed against the judicial admissions that Foreign & McHenry made in their pleadings. The original reason for not paying the entrance magazine charges after three years of paying them, Foreign & McHenry stated that they were not getting sufficient maintenance and they wanted an accounting from Buffalo Grove of expenses on the main entrance magazine. However, this argument was easily dispensed with because Paragraph 4 of the CCR agreement only requires a fixed fee that's contingent upon the actual expenses incurred on the entrance magazine during any given year. There's no duty of the account in the CCR agreement either, and Paragraph 4A specifically states that the entrance magazine charges are payable without deductions set off or prior demand. Following the accounting argument, Foreign & McHenry made some standing arguments, which were not argued during the oral argument presentation today, so I'll move on to the argument that they seem to raise about whether or not Paragraph 4 is a covenant running with the land. I'm a little bit confused by the argument because in one sentence, there's a concession that Paragraph 4 is a covenant running with the land, but then it's being interpreted as being a personal covenant. As this panel correctly pointed out, the plain terms of Paragraph 11 calls Paragraph 4 a covenant running with the land. In their response brief, Buffalo Grove cites a series of SEC district cases that hold that covenants to pay maintenance fees on land are covenants running with the land. In addition, Buffalo Grove cited the Illinois Supreme Court decision in Richmond how the duty to pay assessments is a covenant running with the land. The cases at 400 McHenry sites, including the Fairways case, are entirely distinguishable. By their own terms, they specifically address provisions which provide for the unilateral modification or revocation of restricted covenants, which they interpret as being personal covenants. However, Paragraph 4, the duty to pay maintenance charges towards an entrance magazine, has no relation to the provisions that are addressed in Fairways or any of other 400 McHenry cases. In addition, as this panel noted, Paragraph 11 does identify which covenants are personal. However, Paragraph 4A2 is not one of those provisions identified as a personal covenant. Indeed, the following sentence expressly points to Paragraph 4 being a covenant running with the land. As this panel pointed out, the law in Illinois is that subsequent owners are bound by covenants running with the land. And many of those cases are cited in Buffalo Grove's response brief. And the panel pointed out that Paragraph 11 is tied to the actual parcels, not the identity of the parties, and binds every owner of the parcels to the extent that the obligations to be performed affect their land. I further point out the third recital in the agreement that states, whereas owner desires to develop the parcel, an owner may hereafter elect to convey, lease, or otherwise transfer the parcel to other parties, persons, or entities subject to the terms and conditions here and after set forth. This recital plainly manifests the intent that this agreement remains binding on future parties. The trial court was correct in noting that Forerunner McHenry's argument about successor and interest was a straw man argument in the sense that the term is not used anywhere in the CCR agreement. And the trial court is correct to disregard the argument. But I would note that the LaSalle National case cited in Buffalo Grove's response brief dealt with a covenant that was specifically binding on successors and interest and found that the covenant was a covenant running with the land and was a covenant binding on subsequent owners. Furthermore, in the response brief, we point out that Black's Law Dictionary defines successor and interest as one who follows another in ownership or control of the property. Whatever credence that in consideration the successor and interest argument is given, it still should not overturn the trial court's decision. Moving towards Forerunner McHenry's argument that the CCR agreement terminated at some date, Forerunner McHenry states that it clearly stated in the CCR agreement but doesn't point to that provision. I would point out that in the second district, it was held in the Green Trails case that a covenant that runs with the land binds successor grantees indefinitely. And as this panel pointed out, the obligation to pay the entrance magazine charges under paragraph 482 did not even start until the owner completed construction of its improvements. It goes without saying that sophisticated parties, like the ones who entered into the CCR agreement, would know how to put a time limit or termination date in the CCR agreement, but did not. And this is indicative as paragraph 10 did have a time limit, whereas paragraph 4 does not. And this panel is correct to note that the party's conduct in recognizing the obligation to pay the entrance magazines from when Buffalo Grove owned the parcel in 2000 and then including McHenry's own actions for three years is indicative of how this agreement should be interpreted. Finally, I would like to remark about the judicial admission made in paragraph 9 of their amended defense that the obligations in the CCR agreement lasted in perpetuity. So this judicial admission withdrew the issue of whether or not there was a termination date from this litigation. Indeed, paragraph 17 of their counterclaim calls the obligation for Buffalo Grove to repair the entrance magazine under the CCR agreement, a covenant running with the land. And I would be happy to answer any further questions. Justice Reynolds has one more question. Counsel, how important is it to counsel judges that the court may have to take PHEI offerings in front of senators and clients? Is that actually key here? I'm sorry, I didn't hear you. Someone said this on the phone unmuted. Can you mute your speaker? Yeah, somebody said that. I'm sorry, I don't. I know we've had background interruption here. Let me see. Okay. Now, how do you respond to counsel's argument that the word there PHEIR in front of successors and assigned actually effectively terminated this contract when the Michael Reese development was completed and this contract was not specifically assigned? Thank you. Well, one, the prior sections called a covenant running with the land and by the operation of law, covenants running with the land are binding on subsequent purchasers. And there's no reason why this court needs to interpret the word successors the way Mr. Anaya is interpreting it as there's a case law in Illinois, like the LaSalle national case that interprets successors to be subsequent purchasers. And the Black's Law Dictionary that describes successors as subsequent purchasers. And the Green Trails case that identifies successive grantees as all being bound by the covenant running with the land. And I would further remark that the third recital specifically addresses that concern because it says that the owner, which is foreign McHenry's predecessor may hear it here and after elect to convey lease or otherwise transfer the parcel, but that that conveyance would be subject to the terms and conditions set forth herein. So that would be my response to that argument. And as far as no assignment is being considered, this argument was addressed in the summary judgment briefings in the case Louisville and our company versus Illinois Central, our company, 174-448. And Illinois Supreme Court specifically stated that all covenants that which relate to the land and our forest benefit run with it and may be enforced by each successive assignee into whose hands it may run by conveyance or assignment. So, the Illinois Supreme Court specifically stated covenants that run with the land are binding either through conveyance or assignment and assignment is unnecessary here. Okay, just one other question. How do we know that the contractual 5% yearly increase in the fee has any relationship to the maintenance costs and does that matter? Well, I believe it does not matter. It's, as pointed out, it's by the CCR agreements, paragraph four. It's a fixed fee. And it specifically states that it's payable without deduction or set off. So, we do know that it has no relation to the actual maintenance. I'd further point out the fact that I think this court can draw on its background that certain parties do like fixed fees because they promote predictability in commercial transactions. So that whenever a party does purchase 400 McHenry's parcel, they can, to the penny, calculate their obligations. Where if it didn't have a fixed fee, the number could be random. And the trial court recognized that the 5% actually works out quite well here in the sense that the present amount to repair the entrance magazine, as supported by McHenry's own estimate, was the equivalent of the amount that 400 McHenry owes for those entrance magazine charges. I'd further encourage the court to look at historical inflation rates. And that 5% was the inflation rate in February 1991. And then historically, inflation is higher than 5%. So, in circumstances of high inflation, which is historically the norm, 400 McHenry has a benefit there. Thank you. I'll defer to. Can I just follow up on Justin's last question? The entrance magazine, it has expanded from what it was at the time in 1991 or when the construction of Michael Reese was completed. Is that fair? I'm not sure if it's fair in the sense that it was beyond the contemplation of the parties in the sense that the easement that's written in the CCR agreement specifically states that it's non-exclusive. So, there was no expectation that 400 McHenry would have exclusive access through the entrance magazine. But I'd also further note that if there's any increased use of the entrance magazine, the only party that is harmed by that increased use or increased burden would be my client, Buffalo Grove Ventures, who has to pay for the increased wear and tear from the increased use. And wouldn't get the benefit of the increased maintenance because the fee is fixed and set back in 1991 in accordance with all the parties' expectations. Well, fixed and increasing at 5% per annum. Even though it's now serving the kind of business. I presume that is a function of some of the needed repairs. I apologize. You broke up for a second that I think I missed a sentence. No, actually, you know what? It's I'm going to withdraw my question. I don't have any other questions. Thank you. Thank you. I don't have any questions. Thank you, Your Honor. First thing I want to address is the covenants do not run with the land by operation of law. That's not true at all. They do when they say they do, but they don't just automatically run with the land. That's why we have things like the Fairways Court where they make the distinction between a personal covenant and a covenant that runs with the land. They don't run with the land unless they say they do. Covenants run with the land when, and it's easy to do. I've written hundreds of these. When you want it to run with the land and you want to bind subsequent purchasers, you write in subsequent purchasers. They did not. 4C, 11C, I beg your pardon. The covenants ran with the land, but they didn't run forever. They only ran as far as the parties and their successors and their sides. 4C, paragraph 4C, is emblematic of the fact that it was never intended to run. That they didn't, if Buffalo Grove Ventures' argument was correct, you didn't need 4C. We know that 4C is not a covenant. 4C exists because covenants did not run with the land and that Michael Reist was obligated to pay in the event of a transfer. Paragraph 4 and paragraph 11 simply are, paragraph 4 is limited by 11C. That's as clear as it can be. Covenants do not run with the land unless they say they do. In this instance, they said they did not. The 5% fee that we talked about, eventually that will exceed the value of the Michael Reist parcel. It's absurd. There's no termination. Is that what we're led to believe? We don't need the easement. There's no reason to send a letter. The trial court was curious as to why we didn't send a letter terminating it. Because it doesn't apply. That's why we didn't. We never raised a successor in interest that Mr. Manick just referred to. That was raised by the plaintiff in their argument on summary judgment. We responded by saying there are no, there's no such thing as a successor in interest. Not in Illinois. It's not referred to in the agreement. And it only means successors. To answer the court's question, the entrance magazine has been expanded. We don't need to do a whole lot of looking into that. Look at exhibit C on sub C56. It's a tiny, short, 200-foot east-west road to a very short 100-foot road north to the Michael Reist parcel. End of discussion. Now it's expanded all the way to Buffalo Grove. It services 200 condominium units. It services the plaintiff's shopping center parcel. It services a Culver's restaurant. It services the Deerfield Bakery, the post office. It services the public as a thruway from McHenry Road to Buffalo Grove Road. It services Belmont Retirement Village. It's difficult for me to listen to the discussion about judicial admissions. Justice Mills is famous for saying that facts are not weather vanes. And I like to think of them as stubborn. The fact of the matter is that the joint venture sold two large pieces of property from the joint venture parcel well before they sold the property to plaintiff's predecessor and title. Then plaintiff's predecessor and title conveyed that same missing property, that same property missing those two lots to the plaintiff. They've never owned the joint venture parcel. I guess we should anticipate litigation involving from Boston Market because they're owner of part of what was once the joint venture parcel. Or the Boston Market or the Burger King or the Bolero. These facts are stubborn. The paragraph 11C takes care of this as far as I'm concerned. They did in this instance. But they only did for as long as there were parties to the agreement and there were successors in the science. There are none. And the agreement terminated. The Buffalo Grove subdivision flat easement survived. It was prerecorded in 1988. It's referred to in the agreement. That's where we get access to the property today. We respectfully request that the court reverse the trial court and remand the case to the trial court for further proceedings. Thank you. Justice Zinoff, any questions? Just one. Paragraph 14 is entitled right to modify and really says in essence that this agreement may be terminated, extended, et cetera, by the parties or their successors in the sign. So it did not terminate automatically. I mean, this paragraph envisioned that the parties themselves would have to terminate it. And we don't have any evidence of that. Certainly not in this record, do we? Well, I think we do. And I think paragraph 14 only allows extension. It doesn't necessarily allow, you know, it doesn't trump the paragraph 11C. It allows the extension and it allows that we could terminate it for whatever reason. I don't know what the parties were thinking about when they were developing this property in 1991. Paragraph 14 did allow amendments. No amendments ever occurred. We're stuck with 11C. I don't have any other questions. Thank you. Thank you, Judge. Justice Brennan? No questions. Thank you. All right. I do not have any questions either. Commissioner Anaya, thank you. Thank you, Judge. For their arguments today and the quality of your briefs. The case will be taken under advisement. A written decision will be issued in due course. The court stands adjourned for the day. Thank you, Judge. Very well. Thank you, Your Honor. I will initiate the call.